Case number 19-5489. Anthony Kuklinski v. Department of Treasury et al. Arguments not to exceed 15 minutes per side. Mr. Hannon, you may proceed for the appellant. Good morning, Your Honor, and may it please the Court and Mr. Schechter as well. I'm honored to be here from my home district of Washington, D.C., and I've asked Mr. Milton if I might reserve three minutes for my rebuttal time. I'd like to begin first by talking about the application of this Circus decision in Hale v. Johnson to the Egan issue in this case. First, procedurally, a couple of wrinkles here. Senior Judge Simpson twice granted Mr. Schechter's motion to dismiss the claim to the extent that it intruded upon Egan discretion. However, in both orders, he was careful to say that, quote, in all other respects the claims remain intact. I took that as an instruction to the trial judge when the time came to scrutinize the facts as they stood at the time of the conclusion of discovery and determine which facts or which issues may or may not run afoul of Egan. However, with the motion for summary judgment, the district court accepted Mr. Schechter's argument that Egan provides a carte blanche obstacle to any evidence in this case that we believe was very, very important to the claim of discrimination. The facts that I would like to commend to the court on this issue are the following. During this time period, which was prompted by retaliation of Inspector Kuklinski for supporting the female officer, what happened is, by happenstance, Inspector Kuklinski was applying for his five-year re-up of his security clearance in November of 2011. And the OPM, the Office of Personnel Management, has the task of conducting the investigation and in this case they also conduct the field investigation. In some other agencies that's different. And they concluded at the conclusion of their investigation that his tax issues and his inadvertent failure to report his school board assignment were immaterial to the issue of a clearance and they recommended that his clearance be continued on. At this point in time, he was then kept in the dark and eventually relegated to the maintenance building on April 5th of 2011 while the entire cadre, as we call them, of Mint officials undertook to try to get his security clearance revoked. The only decision maker, the first decision maker they went to was OPM. Irwin Ansher, an attorney, who we claim is the hub of the spoke of the wheel of this conspiracy against Inspector Kuklinski, he tried to get OPM to reconsider their decision regarding his clearance and they summarily refused. Then he asked OIG to get involved in an investigation of these underlying facts and they agreed and summarily concluded that there was nothing wrong and that what Inspector Kuklinski had said to OPM was the truth. Notwithstanding this, from Constable to Bailey to Ansher to Stringer and a whole cadre of other people attempted to do what? They attempted to get DS, Lester Leach, to reconsider, to change his mind. Would your position be that the original investigation was not inappropriate because of the information that had been provided on taxes and the failure to include other employment? No. Our position is that the procedure for a security clearance for the Mint is that OPM makes the decision. OPM made a decision, the facts were set forth, and that was the end of it. The original investigation then was not inappropriate. Correct. You don't claim that that's pretextual because they had a right to do that, to follow up on the information that they were given. Yes, Your Honor, and the facts never changed. The fact of his having filed his taxes late and the fact of his admitting that he had neglected to report his $3,000 school board position, those facts were determined by OPM and found to be entirely innocuous. The facts never changed. What was the status of his security clearance when he was relocated to the maintenance building? It was intact. That was April 5, 2011. Was it under investigation at all? It was under investigation by Connie Stringer, Deputy Chief Bailey, and Erwin Ansher, all of whom, Your Honor, have said in deposition that's not their job. It's not their job. But my point is this. Let me back up on the particular date time, the April 5. Yes. That was when Stringer suspended his police authority and relocated him pending the OIG investigation. Isn't that correct? I believe the OIG investigation had been instituted just before that. But not finished. It concluded very shortly thereafter. My point is this, Your Honor. There are a couple things to say about putting him in the maintenance shed, and I'm going to divert just a little bit for a moment here. That's exactly the case in Hale v. Johnson. This court said that a decision not to allow someone to go into a particular building because of a security clearance review is not something that's protected under EGAN. The same thing is true with Toye v. Holder. That's also a case in which the FBI- Wasn't Hale the physical fitness judgment? There was a- Hale was where they addressed and determined that EGAN didn't extend to physical fitness judgments, right? True. But that's what was the obstacle to that particular employee being able to go into the facility where the TVA needed to have him work. And so in that case, the trial court had to distinguish between EGAN, which in that case clearly had nothing to do with it, and this prohibition on going in. It's important for the court to understand here, and this is not necessarily emphasized in the briefs, but Connie Stringer made the decision that he couldn't go into the Bouillon Depository and put him in first a break room, and then put him in a paint room that they renovated. Now, there's no reason he couldn't have stayed in his own office. Let me understand that, because obviously there was a real problem with where they stuck him. But the question becomes, could he have gone into the old facility when his security clearance was at issue and being investigated? I thought no one could go into that facility in that situation unless they were accompanied at all times by someone else with a security clearance. That's what the government says. However, the testimony in the case is that the administrative suite of offices where Inspector Kuklinski had his office is segregated from the secure area of the Bouillon Depository. You take away his access, and he can't leave those offices. And furthermore, he's in an office adjacent to Chief Stringer. So the decision to put him in the maintenance shed is not only bad, as your Honor seemed to indicate, but there's no need for it. Because allowing him to have his own office... Am I incorrect on the record? Did he not have, in order to get to his office, did he not have to pass through any area that was subject to security clearance? No. So he had exterior access to his office without going through any security clearance? That's his testimony, that there was no reason he couldn't be in the administrative offices. Is that, well, that's a factual question as to whether he was not allowed to access his office without security clearance. And I understand what his testimony is. Was that disputed? Are there records that indicate that he could not reach his office without that clearance? The only evidence I can recall is Chief Stringer's carte blanche statement that because his security clearance was under investigation, he couldn't come into the facility. But my position is that in this case, because of the carte blanche assertion under Egan, there was no discovery allowed of Lester Leach. Now, there's no prohibition under Egan to take the discovery and find out whether Lester Leach is really doing his job or whether he's just a puppet for all these other folks. I want to emphasize that the facts never changed. So I would want to ask Lester Leach, you're sitting there and you are being importuned by all these people where the facts don't change one bit to suspend his security clearance. He issues a letter suspending his security clearance. He cites the tax issue, which has already been resolved. He cites the outside employment, which has already been resolved. And at that point in time, he's already been out of the workplace since April 5th of 2011. He sends that letter November 7th of 2011. And then lo and behold, we then march into the next year. And I finally send a letter to Leach and I say, this is ridiculous, you have to make a decision here or else I'm going to appeal this. And I'm going to bring an APA action for your withholding a determination that he's entitled to. And he restores his security clearance and he cites the very same information that he had cited before indicating that these matters had been resolved. So, as a matter of fact, the evidence regarding his security clearance was already intact before these individuals who admit they had no role in investigating somebody's security clearance put them on the ice. And taxpayers and jurors would wonder, why are they putting an inspector in this type of a circumstance with no duties? There was testimony from Connie Stringer that we didn't even know who was supposed to supervise him. When OIG completed the investigation on May 17, was there a conclusion not that he had violated the law by failing to report his taxes and by his outside employment activities? He hadn't violated any law. What was their conclusion? What was the conclusion of OIG? The conclusion of OPM was that there was no OIG. I'm sorry, Your Honor. OIG? Oh, they confirmed the facts. That there was a violation of the law by failure to report? I don't recall if they talked about a violation of the law, but of course that's a technical violation of the law. You have to report it because of fiscal responsibility. And OPM has to make the determination as to whether that fact suggests he's living beyond his means and is subject to scrutiny or other fashion. And they concluded that he wasn't. And he also has an obligation to report his financial status every year, which he did on a regular basis. And I must emphasize that in the OPM review, even Connie Stringer said there's no reason not to give him a security clearance. So our view on this issue is that no one considered Hale v. Johnson, that we're entitled to an application of Hale v. Johnson by the trial judge, that the total carte blanche dismissal of all of these facts as related to the discrimination claim is an error of law, and that frankly we should be permitted further discovery because discovery doesn't offend Egan. Discovery about whether they followed the procedures, whether Lester Leach says I was just doing it because they wanted me to. Thank you, Tom. Thank you so much. Good morning, Your Honors. Counsel, may it please the Court. Ben Schechter on behalf of the Department of Treasury. I do want to begin with correcting a few statements that counsel has made. As the Court recognized, yes, the OIG did determine, in fact, that there was a violation of federal regulation. He was being investigated for a potential criminal violation, because it is a violation of federal law to willfully not file tax returns. But the conclusions were that he had, in fact, violated the regulations. That was referred then over to the Security Clearance Department. And that was before April 5th of 2011? That was after April 5th of 2011. What was going on in that April time frame? Sure. So in November, he had submitted the information to OPM. November of 2010? Of 2010, yes, Your Honor. And OPM conducts its investigation. The red flags are raised. With those findings, it is then referred on April 5th or thereabouts to the Office of Inspector General for the Department of Treasury. They then conduct the law enforcement investigation into whether these red flags amounted to potential criminal conduct. During this time, his security clearance isn't revoked, though, right? His security clearance has not been revoked. However, his police authority was revoked. And Mr. Kuklinski did testify that that was appropriate procedures that when a police officer, such as himself, is under OIG investigation, police authority is suspended. When that suspension occurred, he was no longer- When was the police authority? April. That was in April? Yes. Okay. Yes. And I do want to also correct the record. There is no evidence that plaintiff's offices somehow were segregated. He did have to go through very heightened security to even access those offices within the actual bullion depository. There's the main building, which is what we've all seen in pop culture, where the gold is stored. That's where his offices were. And you have to go through several layers of security. And you cannot remain in that building unless you have a security clearance. Or if you don't have that security clearance, you're escorted by someone who does. But he had- I'm sorry. No, go ahead. Finish your thought. But he had a security clearance when he was moved, right? He did. But he had lost his police authority. That is my question. What does that mean, to lose your police authority? That means he had no ability to act as a law enforcement officer and could not officially act as such in the context of that building. So he could have been placed on administrative leave, like many police officers are. In this case, they moved him to a less secure building. It's still a building. It houses the maintenance staff and other people. There are offices in there. But is there anything, is there like a handbook, or is there something written that says if you don't have police authority, it's inappropriate for you to be in this building? I do not know. I'm not aware of that. Is there testimony? I mean, is there testimony? Testimony was by the deputy chief of police, Bill Bailey, that he had to be removed from that facility at that time. And there was also testimony from the field chief, the person in charge of the facility, that he had to be removed at that time. There's no evidence suggesting that that is incorrect. I'm not aware of anything in writing as I stand here today. But that is the position of the Mint, is that a police officer under investigation loses their authority, and that's not contested here, and that he had to be removed from the facility at that point in time. Did that argument change on May 17 when OIG completed its investigation and found that there was a violation? That argument did not change at that point because then it was turned over to the security division, Mr. Leach, for their determination as to whether or not it should be suspended. And, in fact, the decision by Mr. Leach was, yes, it should be suspended. And that's what occurred in November of 2011. And why was it not reinstated until March of 12? Presumably they were engaged in fact-finding at that time. Well, your opposing counsel argues that he had already made up his mind and that the clearance should have been issued, but it was kept from being issued by people who didn't like him. Well, I mean, I don't think the record supports that, and certainly there is, and this is where we run up against the Egan analysis and to what extent we allow discovery within, behind the curtain, if you will, with Mr. Leach's department. The evidence that's presented, we did allow discovery on the peripheral of this because we tried to remain consistent to Tenenbaum, this Court's decision in Tenenbaum, and subsequently in Hale. Title VII, there is a preclusion on security clearance issues. Unlike in Hale, which was a Rehabilitation Act case, the Rehabilitation Act does not contain this national security clearance prohibition. So we were trying to balance between the two in discovery, and he engaged in it. What discovery did you give him? We gave him everything up until we did not give him Lester Leach, and he approached the Court to seek Mr. Leach's deposition. The person making that determination, the Court said, you cannot go there. Egan precludes it, and we believe that's absolutely correct and consistent with Egan and consistent with this Court's holding in Hale and Tenenbaum. Hale was a case where it was simply physical fitness. It had nothing to do with national security issues. In Hale, they reiterated the fact that Egan does preclude intrusion into this area that's exclusively within the executive branch of security clearances. And Tenenbaum, I think, is an excellent opinion because it was not a Rehabilitation Act case, and it actually said the only time you can invade this is, look, we're looking for allegations of constitutional violations or allegations of security, in this case, the Mint's or Treasury's directives on policies and procedures governing security clearances, regulations. None were alleged in this case. The District Court flagged that for them not once, not twice, but three times. And even after an amended complaint was filed, following all of the discovery other than Mr. Ansher, discovery had been completed, they filed an amended complaint, they still do not raise any violation of any Mint policy, any Department of Treasury security directive, any regulation, any statute that was violated in the context of this security clearance. Well, what about then when the security clearance is reinstated in March of 12, and at the same time, he gets reassigned to Washington, D.C.? Yes, and that's, I think, a very important point here and where I wanted to start this argument. I think it is important for both sides because I think what we need to remember is this is a retaliation case. This is a case where the appellant is alleging that the U.S. Mint took these actions because he was engaged in protected activity. And the facts simply do not support that. And if you go back to the security clearance issue, if you go back to what actually was occurring before he engaged in any protected activity, before he engaged in any protected activity, headquarters for the U.S. Mint went down to Fort Knox because they were hearing that morale was terrible. They conducted interviews, and they found that the appellant here was a ruthless, harsh manager. He was counseled on that, again, before any protected activity ever occurred. And the counseling memo actually told him, your conduct will no longer be acceptable if you wish to remain in this position. And this goes on for many months, for a couple years. There's plenty of evidence throughout the record that the appellant was not capable of managing these employees, that the employees were distraught. They found it to be a ruthless and aggressive management style. And that wasn't only the conclusions reached by the people who went down to investigate within the Mint. Those were the conclusions. But the relocation took place, what, three years after that? After they went down there to investigate the morale and all of that? I mean, in other words, let's assume, okay, he's a terrible manager, the morale's bad, we're going to move him out. Why did it take so long? I mean, why don't you just say at that point, okay, we've got to move you to someplace else? Well, I think if the security clearance issue had not come up, they would have. And the fact is that the appellant was the number two in command. The number one in command at that Boolean depository was removed, had not had these issues with the security clearance. And probably the appellant would have been removed, but for the fact that this window had happened where he was now under OIG investigation and then the security clearance. And they really couldn't take any action against him during that time because he had already been removed because his police powers were suspended. But they did. It was more than just three years. I mean, it was within a year that Carol Nichols, the USIS or UCSIS, the private contractor's report came out in January of 2011, finding all of these problems with Mr. Kuklinski as a manager. So it's not quite three years, but I mean there is a year gap thereabouts from the time that they removed him. So going back to the case of retaliation, I think some of the statements that I've heard are speculation and conjecture. And I would remind the court, and I think the court is well aware, that it is the appellant's burden in this case to prove that he was retaliated against. And this court has said what that definition is under the McDonnell-Douglas test. And post-Nassar, University of Texas Southwest Medical Center versus Nassar, it's a but-for causation standard. So the court in this case, the district court, found that he had established a prima facie case on four of the seven allegations, the Egan case, the Egan aspect she did not address, the district court did not address. And that was based solely on temporal proximity. But really the heart of this case goes to pretext. I mean, as many of these cases ultimately do. Because the district court considered all those eight factors, but really didn't consider the totality. So let's just assume that in the totality of those circumstances, there was a prima facie case. So why is this not, why is it not pretext what occurred in this case? So the question is, has the appellant demonstrated here that the offered reasons, we assume that the legitimate non-discriminatory reasons given by the Mint are acceptable. So then the burden shifts back to the appellant. The appellant has to show that those reasons and the actions taken because of those reasons had either no basis in fact, that's not alleged here, that the reasons were insufficient to explain the employer's actions. I don't think they're contesting that here. So then we're left with the proffered reason was not the actual reason for the employer's action. And there's nothing in the briefing and there's nothing in the record that would suggest that they have demonstrated that that's the case here. And we can go through each of the eight different enumerated ones, one by one if the court likes, but we did address that in our brief. And there's the logical fallacy, you know, that's where this emerges. There's no connection where he can demonstrate with the record that he has presented significant probative evidence that the proffered reasons offered by the Mint were not the actual reasons. And under Nassar, it's a but-for standard. So and we talked about Judge Ginsburg's dissent, which I think this court recognized in one of its cases, where she says even if you have mixed motivating factors now, no longer in a post-Nassar world will that rise to the level of actionable Title VII retaliation. It has to be the driving factor, the only reason that this occurred. And the plaintiff or the appellant has not demonstrated that in this case. With regard to Egan, I think we've addressed everything there. Again, I would urge the court to look at Tenenbaum, because I think that fits most appropriately into this case. And Tenenbaum, which is an unpublished decision, but Tenenbaum does suggest that the only two causes of action can be based on the constitutional violation or potential regulatory violations. And I think Tenenbaum is also instructive, because it cites to the Fourth Circuit decision, Becerra. Becerra is a case where actually the court said, Egan precludes anything related to the investigation of a security clearance. And that's essentially the approach that the District Court took here. The District Court did cite Becerra and Tenenbaum and said, this is where you can go and this is where you cannot go. In the discovery that you said, the peripheral discovery that you said you allowed, who was deposed pursuant to those discovery requests? Field Chief Stringer, who you mentioned, Deputy Chief Bailey, Chief O'Connor. These are people in Washington, D.C. There's a commander constable who was also part of D.C. Those are the main decision-makers. Afterwards, he was able to depose Irwin Ansher, the general counsel, but that was a limited deposition. There were preclusions because of, obviously, attorney claims. Why would any witness be barred? Why would you bar any witness from a depot just categorically? In other words, I'd depose Leach, but I can't talk about, I mean, why is it just I can't talk about certain topics, but I can explore whether he was actually motivated by, or was violating a statute, or whatever the exceptions would be for Egan. Why cut it off at the witness level as opposed to kind of the topic level? Well, because I think that's what Egan says, is it's not justiciable when you're dealing with security clearance issues. And Lester Leach's only role in this was the determination as to the security clearance. And so for him, he wasn't. But what if Stringer had called him and said, this guy's a problem, I want his security clearance revoked? He's just a problem employee, he's reporting us to the higher-ups, we want him out of here. Well, I think. I can't ask, hey, did you ever have a phone call? Were you ever asked whether to revoke this guy's security clearance? I mean, why can't I just explore those topics at a depot? Well, because I think Egan precludes it, and I think there's reference to Rattigan, which is a district court, I'm sorry, a D.C. appellate court decision. And they originally went down that path, and then they backed off on rehearing, and they said, no, Egan does preclude this, only if there are materially false statements being made, because there's a balancing act here. Employees have an obligation under executive order to make referrals related to national security clearance issues. Those are beyond Title VII retaliation claims. And Judge Kavanaugh at the time, in his dissent in Rattigan, makes that very clear, that he would have actually applied Egan across the board. So in the context of Lester Leach, we did allow, to some degree, the Connie Stringer, did you have communication, what was your involvement? The record does not exactly say what was being presented here today. The only thing Connie Stringer did was provide information in the context when asked, but she also has a separate affirmative duty under the executive order to make referrals, and that's something that Egan prevents discovery into in the context of Title VII cases. I see that my time is up. Okay, well thank you. Judge Stranch, the OIG investigation was completed May 17, 2011. The importance of that is that Inspector Constable solicited them to conduct that investigation by lying to them. He told them that OPM was reopening their investigation. In any event, OIG doesn't have a role in security clearance investigations, and there's no evidence that Lester Leach suspended his security clearance because of the OIG report on May 17. He did not suspend his security clearance until November 7, 2011, and all he talked about was the same information that OPM had already found about the taxes. Judge Nalbandian, the issue about access and whether he couldn't go into the building or not is something that we were entitled to a decision on by the district court, and I think Senior Judge Simpson anticipated that after discovery that was going to take place. With respect to the revocation of his police powers, that was done under a mint directive that says that you can only do that if you're investigating someone for a crime. Connie Stringer said that she was investigating him for a crime, the crime of failing to file his taxes. Now, a jury can conclude that that's preposterous, particularly when the OPM has already decided he's not a security clearance risk because he owes $2,600 in back taxes and he's made an arrangement to repay them. Help me understand, didn't OIG on May 17 conclude that he violated the law by failing to report? It was not pay, it was failing to report his taxes and his outside employment activities. That's correct. That's correct, isn't it? That's correct, however, there's no evidence that Lester Leach relied upon that in connection with his security clearance, and they should have, they could have, I'm sorry. Wouldn't you have to actually depose Lester Leach and ask all of the questions about how he made a revocation decision about a security clearance in order to... Our position is that we're entitled to a deposition, but however, on the facts that are before the court right now, the evidence is that OPM cleared him, that the facts never changed. This is not a case where they're relying, such as the Rattigan case in the District of Columbia. This is a case where they were continuing to investigate him for facts that had already been established and did not result in a revocation of a security clearance. They're simply lobbying Lester Leach, and that's impermissible. His assignment to D.C., three days before he got the assignment to D.C., Inspector Stringer gets an email from Constable, and he says, I'm fixing things. We're going to, don't worry, I'm fixing things. And on March 1st, Lester Leach says, your security clearance is reinstated. That, to me, says that they're all in cahoots, they're all in Washington, D.C., in their offices with Lester Leach. Lester Leach gets my letter. He's got to reinstate his security clearance. Before that letter is even signed, they're coming up with another idea. They're going to do a reassignment to Washington, D.C. And the complaint is that they did this because he filed the EEO support of the harassed employee. So this is only a retaliation claim, correct? Well, by this point in time, yes. But he has his own EEO case by this point in time. And that's one thing that did move the court below. I think your time is up. Thank you very much. To summarize. My pleasure. We thank you both for your arguments. The case will be taken under advisement and an opinion entered in due course. Thank you. You may call the next case.